UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RICHARD ROBERT LEE GOMEZ individually. | § | CIVIL ACTION NO.5:25-cv-00013 |
| | § | |
| | § | **COMPLAINT FOR DAMAGES** |
| *Plaintiff,* | § | |
| | § | 1. *Negligence* |
| | § | |
| *v.* | § | 2. *42 U  C;sec. 19 83,etseq* |
| | § | |
| BEXAR COUNTY, TEXAS, | § | 3. *8th Amendment United States Constitution* |
| | § | |
| *Defendant* | § | 4. *Fourteenth Amendment to United States o/the due process clause* |
| | § | 5. *Jury Trial Demanded pursuant to Fed R. Civ. P. 38 (b)* |
| | § | |
| | § | |

## PLAINTIFFS' ORIGNAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

COMES NOW, Richard Robert Lee Gomez, herein after referral to as Plaintiff, complaint of

Bexar County, Texas, herein After o f Action would show this Court the following.

Plaintiff files this complaint and for cause of action will show the following. Richard Robert Lee Gomez was assaulted while in the custody of the Bexar County jail by inmates. when his cell door opened,. The Bexar County detention officers opened his cell door or allowed inmates access to the door cell equipment ,allowing them to assault the Plaintiff. This led to his massive personal injuries that were sustained. Bexar County policies, and/or customs were moving forces behind Mr. Richard Robert Lee Gomez injuries.

I.    Introductory Allegations

A.    Parties

1.    Plaintiff Richard Robert Lee Gomez sues as a result of the assault that resulted in his permanent personal injuries he sustained while in custody of the Bexar County jail. Herein referred to as "Plaintiff". Plaintiff asserts claims and damages available under law to Plaintiff.

2.    Plaintiff Richard Robert Lee Gomez is a natural person who resides and is. domiciled in Texas. Plaintiff su s in his individual capacity and seeks all damages available to him as a result of the assault his suffered while in the custody of the Bexar County Detention center "jail".

3.    Defendant Bexar County, Texas ("Bexar County" or "County") is a Texas County. Bexar County may be served with process pursuant to Federal Rule of Civil Procedure 4G)(2) by serving its chief executive officer, Honorable County Judge Peter Sakai, at 101 W. Nueva, 10th Floor, San Antonio, Texas 78205, or wherever Honorable County Judge Peter Sakai may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a County as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).

4.    B e x a r  County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all

relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983),and the 8th amendment to the United States Constitution.

5.      B e x a r  County's policies, practices, and/or customs were moving forces.

behind, and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages referenced in this pleading.


## II.    Jurisdiction and Venue

1.      The Court has original subject matter jurisdiction over this lawsuit.
according to 28U.S.C. § 1331 and 1343(4), because this suit presents a federal
question and seeks relief pursuant to federal statute(s) providing for the protection.
of civil rights.  This suit arises under the United States Constitution.
and 42 U.S.C. § 1983.  The Court has personal jurisdiction over County because it is a
Texas county.  Venue is proper in the San Antonio Division of the United States District
Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial
part of the events or omissions giving rise to claims in this lawsuit occurred in County,
which is in the San Antonio Division of the United States District Court for the Western
District of Texas.

## III.   Factual Allegations

1.      Plaintiffs provide in factual allegations sections below the general
substance of certain factual allegations.  Plaintiffs do not intend that those.
sections provide in detail, or necessarily in chronological order, any or
allegations. Rather, Plaintiffs intend that those sections provide Defendant sufficient fair notice
of the general nature and substance of Plaintiffs' allegations, and further demonstrate that

Plaintiffs' claims have facial plausibility. Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, or provide a person's name, Plaintiffs have done their best to do so accurately and without any typographical errors. However, some typographical errors may still exist, and when applying to a name, the name might be spelled phonetically.

Plaintiffs plead facts which give rise to, and thus assert, conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental entity or governmental actor. In the alternative, Plaintiffs plead facts which give rise to episodic acts and/or omissions claims. Regardless, pursuant to United States Supreme Court authority, Plaintiffs need not assert in this pleading specific constitutional claims but rather must merely plead facts which plausibly give rise to constitutional claims. Plaintiffs thus ask that the court apply the correct legal theory or theories to the facts pled.

Plaintiffs are not pleading their "best case" and will only be able to do so after conducting discovery. Plaintiffs do not intend to "stand" on this pleading but will seek leave to amend as further facts are developed, or in the event any court determines that Plaintiffs' live pleading is deficient in any manner.

## IV.    Mr. Gomez's Assault in the Bexar County Jail

7.    Mr. Gomez's suffered an assault on or about January 7th, 2023, as a result of being incarcerated in the County jail. He was assaulted by inmates, known or unknown, while he was in his jail cell. The county's policies, practices, and/or customs caused, were

proximate causes, or were producing causes and were moving forces behind Mr. Gomez's suffering and permanent injuries and all other damages referenced in this complaint. This section of the complaint provides only with some material facts related to Mr. G o m e z ' s suffering and injuries. Plaintiff will set forth other material facts related to his suffering and personal injuries in other portions of this complaint.

## V.    Summary

10.    Mr. Gomez was Assaulted by inmates while he was incarcerated in a holding cell. Mr. Gomez, while sleeping in his holding cell, opened, and he was severely beaten by (3) inmates Later ,again his cell door opened, and he was assaulted by the same inmates. The plaintiff maintains that the holding cell door was either opened by the detention guards on duty or them through there inattention allowed the assaulting inmates to access the equipment that controls the holding cells.

Mr. Gomez on the second assault was witnessed by one of the detention guards, and he also kicked plaintiff on his head with his boot ,causing more severe injuries. The detention guards did not provide medical treatment to Mr. Gomez until the next shift of jail personal who saw his grave and bloody condition and transported him to the University hospital.

14.    Regardless, as indicated a b o v e , there was no continuous surveillance either by video or in person, and Mr. Gomez laid in his cell without any medical treatment for a considerable time.

15.    Mr. Gomez, for almost 8 hours or more sustained heavy bleeding to his face head and body and transported to the hospital via ambulance.

A number of facility incident reports were generated by the Bexar County Sheriff's Office ("BSCO") Adult Detention Center as a result of Mr. Gomez assault and injuries , However, although requested ,no reports have been provided by the sheriff's office. An investigation was conducted by investigators. Hernandez. Plaintiffs' counsel attempted on several occasions to obtain records from the third-party representatives and has made several. attempts to call. the investigators, without response These results will probably be obtained. through discovery.

## VI.    Prior incidents occurring at Bexar County Jail

There have been deaths and injuries of pre detention defendants awaiting court occurring in the Bexar County jail for years, and which were well known to the public, Bexar County Commissioners, the Bexar County Sheriff, and people working in the jail. Some of this knowledge is described elsewhere in this pleading.

## VII.    Medical Records

65.    San Antonio Fire Department records, addressing the emergency medical services response to Mr. Gomez's assault, EMT-paramedics were dispatched.

66.    Medical personnel described Mr. Gomez's condition. He was assaulted in.

a correctional facility by three people with kicks and punching initially found to have brain.

bleed ,facial and left rib fractures .Gc CS 1S with complaints of head eye , neck bilateral

flank pain .Ct. scan of the head performed demonstrated 5mm subdural versus epidural

## VIII.    **Bexar County's Liability**

### 1.    Introduction

67.     Plaintiffs set forth in this section of the pleading additional facts and allegations

supporting liability claims against County pursuant to *Monell v. Department of Soc. Svcs.,* 436.

U.S. 658 (1978). It is Plaintiffs' intent that all facts asserted in this pleading relating to policies,

practices, and/or customs of County support such *Monell* liability claims, and not just facts and

allegations set forth in this section. Such policies, practices, and/or customs alleged in this

pleading, individually and/or working together, and whether supporting episodic acts and omission

and/or conditions of confinement claims, were moving forces behind and caused the constitutional

violations, and damages and death, referenced herein. These policies, practices, and/or customs

are piled individually and alternatively. Bexar County knew, when County incarcerated the

plaintiff, that its personnel, policies, practices, and/or customs were such that it could not meet its

constitutional obligations to provide medical and mental health treatment to, and protect, the

Plaintiff. County made decisions about policy and practice which it implemented through its

commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice

and/or custom that such practice and/or custom became the policy of County as it related to its jail.

The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading

stage the identity of chief policymaker(s). Any argument to the contrary would be made in bad

faith.

## IX.    **Bexar County Jail's Prior Inmates' deaths And  Injury's**

The fact that the Bexar County jail was effectively an operational mess for years       was known

either to Bexar County or the public at large. News media reported for years about issues at the Bexar County jail.

68.     On August 15th, 2019, the opinion article indicates that the writer has been doing a lot of thinking about the problems at the Bexar County jail. The opinion/article points out that the Bexar County Sheriff's Office is a two-tiered system, one tier relating to law enforcement and the other to detention. Generally, elected sheriffs focus more on law enforcement than detention. Thus, the detention officers "are treated as lesser officers" as compared to law enforcement counterparts. Regardless of the veracity and/or applicability of these opinions, which upon information and belief are true, the opinion piece/article indicates that problems at the Bexar County jail were well known likely long before August 2019.

69.     A January 15, 2020, article indicates that a criminal investigation of University Health System staff was underway at the Bexar County jail. This investigation was disclosed, at least in part, by Sheriff Javier Salazar. Sheriff Salazar said, "We have had deaths at the Bexar County Jail. My belief is that they were receiving less than stellar service at the Bexar County Jail. I find that unacceptable." Sheriff Salazar, in a September 4, 2020, letter, wrote that University Health System staff working in the jail had shown a lack of cooperation when it came to giving the Bexar County Sheriff's Office potentially lifesaving information regarding detainees. Sheriff Salazar indicated that the jail needed to know when there was something life-threatening going on with a detainee to assure that the person is taken care of. Sheriff Salazar was apparently referencing a situation in which detainees would receive treatment, but medical personnel would not share information regarding the treatment and or additional issues with the Sheriff's Office.

70.     Upon information and belief, long before Sheriff Salazar announced a criminal investigation, he and the Bexar County Commissioners were fully aware of problems with detainees, such as the decedent, receiving appropriate medical care. Bexar County, whether through its sheriff's office or its county commissioners, cannot blame medical personnel Bexar

County chose to fulfill its constitutional obligations to protect incarcerated detainees. Bexar County owed non-delegable duties to protect the decedent and others who are incarcerated.

71.    A December 21, 2020, article addressed the Bexar County jail's high staffing turnover and excessive overtime. Upon information and belief, high turnover at the jail was due to a number of issues, all of which were in control of the Bexar County Commissioners and the Bexar County sheriff. Upon information and belief, such issues included the failure to appropriately compensate jailers, requiring unwanted overtime, failing to assure full and complete staffing, and failing to appropriately manage those working at the jail. The article read in part that the "problems of high turnover and overtime have plagued the Bexar County Jail for more than a decade." Further, the article indicated that officials say that such concerns have finally "reached a critical mass in the wake of a state crackdown on jail standards and staffing challenges" (which at the time were posed by the pandemic).

72.    A County Commissioner-elect, Trish DeBerry, indicated that the jail would be an issue and continue to be an issue until County chose to "dedicate time, energy, and resources to try to figure out what the problem is." The article noted that Bexar County had spent nearly $24 million on overtime at the jail in the prior four years, with $10 million of that amount for the prior year alone. County Judge Nelson Wolff said that Bexar County had "gone through this year after year after year." County Commissioner Tommy Calvert said, "It sounds like there's a real crisis in that detention center that we've got to better address."

73.    The article cited Jeremy Payne, President of the Deputy Sheriff's Association of Bexar County, comparing the Bexar County Jail to a foreign "sweat shop." He cited a scathing survey of deputies working in the jail, which suggested a majority were dissatisfied and that many were overworked. The survey, conducted by two local mental health researchers of nearly 350 deputies, including 230 detention officers, cited compassion fatigue and burnout which could present higher risk-taking behavior in officers. Such risk-taking could be drug and/or alcohol abuse

and/or domestic violence. It could also lead, upon information and belief, to a failure to fulfill duties in the jail, such as appropriately observing detainees and/or providing timely medical care. The article also indicated that there were 250 open positions for jailers at the jail.

74.    An October 18, 202, article detailed the plight of Cody Demond Felonry, who was a young man experiencing homelessness and mental health issues. He was arrested and incarcerated in the Bexar County Jail. He was then, according to the article, "lost in the system." The court order for his release was sent to, apparently, Bexar County jailers. "But nothing happened." Even though he should have been released and had accrued 563 days of incarceration, he wasn't released that day, or even the next. Ultimately, he served five months longer than he should have in the Bexar County jail.  It was only discovered that he was being incarcerated against his rights when there was a review of cases by the Bexar County Sheriff's Office. This was yet another symptom of the apparent seemingly substantive lack of organization and competence in the Bexar County jail. If Bexar County was unable to even determine whether it could lawfully incarcerate those in its care, it likewise was unable to appropriately provide medical care and/or observe and check on detainees.

75.    An October 19, 2021, article entitled "Sheriff Salazar Spars with Bexar County Commissioners Over Consulting Firms" shows the significantly low level of commitment of Bexar County officials to assure that its jail was run appropriately. Bexar County Commissioner's Court approved an agreement with a firm in Florida, American Correctional Consultants, at a "contentious meeting." The cost was not to exceed $20,000.00. This was apparently to be a secondary, if not competing, inspection of the jail with regard to another firm which Sheriff Salazar indicated he would retain to conduct an inspection and submit a report. Sheriff Salazar indicated that he retained jail consulting firm Detain, Inc. to conduct an inspection and submit a report separate from the County's retained contractor.  He indicated at the meeting that he would use $49,000.00 in asset forfeiture funds to pay Detain's bills. Regardless, even adding the two amounts

together, the county's decision to spend only roughly $69,000.00 to attempt to cure issues in a jail with a budget of millions of dollars was woefully inadequate. It was in effect attempting to put out a fire with a water pistol.

76.     In May 2022, Bexar County Sheriff Javier Salazar said in a press conference that "a Bexar County Sheriff's Office deputy was arrested after attempting to smuggle marijuana and synthetic marijuana into the Bexar County Jail." Kolbe A. Counts Ramirez, 21 years old, was arrested on three charges, which included possession of a controlled substance and possession of marijuana. Deputy Ramirez was the sixth Bexar County Sheriff's Office deputy arrested that year.

77.     In May 2022, long after the time when it would be able to help the decedent, a grand jury returned indictments for seven people accused of smuggling drugs into the Bexar County jail. There were a number of charges against each such person, and indictments indicate that the occurrences were between February 16, 2019, and May 25, 2019. Thus, as described elsewhere in this pleading, Bexar County had plenty of time prior to the decedent's entry into the jail to address its apparent significant issues.

78.     A July 17, 2022, article described other issues in the Bexar County jail. The article referred to a recent dispute between the Deputy Sheriff's Union and Bexar County officials regarding locks in jail. The dispute involved whether locks were broken or simply needed to be replaced. Apparently, as a result of the dispute, Bexar County Commissioners approved roughly $500,000 to replace almost 400 locks in the Bexar County Adult Detention Center. Leadership at the Deputy Sheriff's Association of Bexar County welcomed the news but said that it "barely scratches the surface" of challenges facing both jailers and detainees at the 30-year-old jail.

79.     Moreover, the Association representative also mentioned a staffing shortage. The article indicated that "hundreds of positions remain unfilled." Further, Bexar County has required mandatory overtime. Some jailers were upset about being forced to work additional shifts, which included concerns about exhaustion and safety. They felt that there was no immediate relief in

sight. Sheriff Salazar, who is responsible to set policy, practice, and custom in the jail, said, "It irks the crap out of me that things move at the speed of government around here." Ronald Tooke, president of the Deputy Sheriff's union, said that Bexar County was losing jailers to other law enforcement agencies and industries that pay better and are safer because of the "toxic burnout" that comes from working in the Bexar County jail. He also indicated that jailers often have to wait weeks and months before being paid for mandatory overtime because Bexar County Commissioners must approve overtime expenditures. This certainly led to a decrease in morale and, consequently, a decrease in safety in the jail.

80.    Mr. Tooke also said, "Our jail is in disrepair due to the lack of preventive maintenance . . . creating an even bigger security issue." Sheriff Salazar, who must rely on Bexar County Commissioners for funding, indicated in the article that he needed $150 million to update the Bexar County Jail.

81.    A July 28, 2022, article described additional issues with the Bexar County jail, specifically related to what the article describes as "poor maintenance practices that have produced intolerable working conditions, which are causing deputies to quit in droves." Ronald Tooke said, "If I had to go to a dump and work in that place every day, it would probably wear me down too." Mr. Tooke heard complaints on a daily basis and saw them firsthand from his time working in what the article refers to as a 40-year-old jail. Mr. Tooke further said that when things are as bad as he described in the jail, "It affects everybody's morale, their mental health, their health." Tooke also said, "It's just an overall demoralizing workplace." He said that the jail needs a major overhaul and listed a number of complaints, including faulty air conditioning, unusable jail cells, water leaks, sewage leaks, and malfunctioning surveillance cameras.

82.    In or about August 2022, former Bexar County Sheriff's Office Deputy Mario Sepulveda, 21 years of age, was arrested and charged with abuse of official capacity and possession of a controlled substance inside a correctional facility. An arrest warrant indicated that on June 21,

2022, a source tipped off authorities about narcotics entering the Bexar County jail. The source indicated that Mr. Sepulveda was sneaking drugs into the 2A unit for a male detainee. The drugs were allegedly supplied by the detainee's girlfriend and were being purchased via Cash App. Deputies found methamphetamine and synthetic marijuana in a cell, and further discovered that Mr. Sepulveda and the detainee's girlfriend had more than 100 telephone interactions.

83.     An October 5, 2022, article references portions of a report drafted by Detain Inc., related to the Bexar County jail. Detain Inc. was retained by the Bexar County Sheriff's Office to conduct an inspection of the jail, at a cost of roughly $50,000. The report read in part, "The Bexar County Jail faces significant detention officer staffing shortages along with significant mandatory overtime in critical inmate supervision roles." The report also recommended pay increases for entry-level positions of 15% to 20%, and also raises for more senior jail staff. The article indicated that the report "provides evidence that Bexar County correctional officer pay is far below all other major Texas counties." Detain Inc., also recommended moving from a 40-hour work week to a six-day 48-hour work week to "limit the chronic overtime paid to officers [according to the article]."

84.     A November 29, 2022, news story references portions of a report from outside agency American Jail Consultants regarding the Bexar County jail. The report touched on issues facing the Bexar County jail for years, including low staff morale, an increase in overtime expenses, and a high inmate population. Among other things, the report indicated that Bexar County's starting salary for jailers lags behind other major cities in Texas including Austin, Dallas, and Houston. The agreement to conduct the study and provide the report was signed in October 2021.

85.     A January 31, 2023, news story indicates that a purported class action lawsuit was filed against Bexar County for keeping people in custody after the law required their release. The "over detention" lawsuit arose as a result of an inmate allegedly being held an additional three days

past the date on which he was to be released. The lawsuit alleges that 15,000 people are released on bond from Bexar County jail each year, and that the County and the Sheriff's Office have been aware of systemic problems and delays in processing bail payments as well as the widespread problem of resulting over detention. The lawsuit further alleged that the Bexar County Sheriff's Office used a batch system of processing bonded prisoners, whereby prisoners would be placed into a cell after they were bonded but not released until the cell reached a specific detainee count threshold.

86.     An April 20, 2023, article indicates that nearly three-hundred Bexar County jail inmates were "in limbo" due to delays in transferring them to a state mental hospital. There were, at the time, 279 inmates sitting in the Bexar County jail waiting to be transferred to a state hospital to begin competency restoration care. Competency restoration care is necessary when detainees are found incompetent to stand trial. As a local state district judge acknowledged, a jail cell is "probably not the best place to put an individual who is waiting competency restoration." Bexar County apparently did not have a competency restoration program in place, although other Texas county jails do have such a program. Regardless, the continued incarceration of severely mentally ill people, and the resources it taxed, affected care and observation of other detainees in the jail.

## X.     TCJS Records Demonstrating County Practices and/or Customs.

87.     TCJS reports and documents regarding inspections of the County's jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, producing causes of, and/or moving forces behind damages (including death) asserted in this pleading.

88.     The TCJS conducted an inspection of the Bexar County jail from February 24 through 27, 2014. Among other things, the TCJS found that a jailer did not even have a temporary jailer's license. Upon information and belief, Bexar County may have frequently used jailers who

did not have permanent jailer's licenses, but instead only temporary jailer's licenses. A temporary jailer's license requires no education and no training. Thus, by way of example, a person could be working at a convenience store one day, having never worked in a jail, and then the next day apply for and begin working in the Bexar County jail.

89.    The TCJS also found during the same inspection that a magistrate was not being notified when a CCQ resulted in an exact match, confirmed match, or possible match. It is vitally important to notify a magistrate, someone outside the jail who can act, when a detainee record indicates that the detainee may have received mental health care before incarceration. This is the purpose of conducting a CCQ.

90.    The TCJS inspected the Bexar County jail again on March 29, 2018. As a result of the inspection, Bexar County was found to be noncompliant with TCJS minimum standards. The TCJS urged Bexar County to give areas of noncompliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. The TCJS instructed Bexar County that failure to initiate and complete corrective measures following receipt of the notice of noncompliance could result in issuance of a remedial order.

91.    TCJS noted, when viewing the size of the exercise area in the Bexar County jail, that more detainees were being allowed to attend recreation than the space would allow. No more than one detainee could be placed in an exercise area of that size, which was 291 square feet, at a time.

92.    Moreover, the TCJS determined that irregular and regular searches for contraband were not conducted between April and August of 2017 in Unit CC. This was a housing location from which three detainees would eventually escape. Detainees were throwing handmade lines to the ground outside the jail to bring objects into the jail. The failure to conduct contraband checks confirmed the general indifference to detainee conditions.

93.     The TCJS inspected the Bexar County jail again from February 19 through 22, 2019. Once again, the TCJS found the Bexar County jail to be noncompliant. Once again, in writing, the TCJS notified Bexar County that it needed to give areas of noncompliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. TCJS once again warned Bexar County that its failure to initiate and complete corrective measures following receipt of the notice of noncompliance could result in issuance of a remedial order. The Bexar County sheriff, jail administrator, and a Bexar County Commissioner's Court representative signed a document acknowledging receipt of information related to issuance of the notice of non-compliance. Upon information and belief, the Bexar County sheriff, jail administrator, and a County Commissioner's Court representative always receives copies of TCJS inspection and other documents regarding Bexar County jails promptly after such documents are created.

94.     TCJS found a number of violations of bare minimum standards in its February 2019 inspection. TCJS determined that Bexar County had employed and authorized civilian employees to perform detainee releasing officer duties, when minimum jail standards require releasing officers to be appropriately licensed personnel. Further, Bexar County jail staff routinely exceeded custody reassessments as required by TCJS minimum standards. One file even exceeded the 90-day limit by 27 days.

95.     Moreover, Bexar County chose to employ unauthorized civilian employees to perform duties of health personnel or trained book-in officers, thus further violating TCJS' minimum jail standards. Bexar County was also unable to provide training records to confirm that detention officers had received suicide prevention training in accordance with approved operational plans. Bexar County jail observation logs also indicated that jail staff exceeded the required 15-minute face-to-face observations of detainees on a continual basis. Further, for those detainees requiring 60-minute face-to-face observations, observations were not conducted timely,

on a continual basis, exceeding the 60-minute requirement by as little as just one minute and by as many as up to 126 minutes.

96.    Further, TCJS determined during that inspection that the Bexar County jail administration had employed unauthorized civilian employees to perform duties of licensed jailers. The civilian employees were not licensed by the Texas Commission on Law Enforcement (TCOLE) as required by law. TCJS also determined that Bexar County jail administration had employed unauthorized civilian employees to perform duties of bailiff or peace officers in the security perimeter of court holding cells, rather than being licensed as jailers by TCOLE as required by law. Finally, the TCJS inspection team was unable to verify, through Bexar County documentation, that recreation was being offered to inmates at least three days a week, for one hour each time, as required by minimum jail standards.

97.    The Bexar County jail's problems continued. Bexar County once again failed a TCJS inspection, such an inspection occurring on May 8, 2019. Once again, TCJS had to remind Bexar County to give areas of noncompliance its serious and immediate consideration and promptly initiate and complete appropriate corrective measures. Bexar County was once again warned, apparently against the backdrop of its failing to remedy issues, that its failure to initiate and complete corrective measures could result in the issuance of a remedial order. Bexar County's continued failure to appropriately monitor inmates, when such observations are designed not only to protect inmates but staff as well, was documented in the TCJS special inspection report. After reviewing documentation provided by Bexar County Jail's administration, TCJS determined that Bexar County Jail staff exceeded the 60-minute face-to-face observations of detainees by as many as 119 minutes. Thus, detainees could go unmonitored for as long as three hours. Bexar County's continued custom and practice of failing to properly observe detainees would lead to serious injury and death.

98.    Bexar County's continued problems, of its own making, were documented in a

report resulting from a TCJS inspection from January 27 through 30, 2020. When walking through the jail, the TCJS inspection team saw several detainees housed in the transport hub pending housing. Three of the detainees had been in the cell for longer than the 48-hour maximum time period. This is a minimum jail standard designed to avoid injury and/or death to those held in such a holding cell. As a result, Bexar County jail shift supervisors had to email the lead TCJS inspector, on a daily basis, a list of all inmates housed in transport hub holding cells and the hours that they were initially booked, for the following 30 to 90 days, for TCJS review. TCJS also required Bexar County jail administration to assign a classification officer to the transport hub to ensure that inmates were housed in a timely manner.

99.     Moreover, during the same inspection, while reviewing suicide prevention training, the TCJS inspection team determined that a portion of jail staff were past due on annual training. The TCJS pointed out that suicide prevention training was already an issue at the 2019 annual inspection. Thus, Bexar County was giving short shrift to requirements imposed on it by TCJS pursuant to minimum jail standards.

100.    Further, as a matter of happenstance, while the inspection team was walking through the jail, it saw that detainee Trevino was in a holding cell in the transport hub. When interviewing detainee Trevino, the inspection team learned that he was on occasion not receiving medication and wound care in accordance with physician's orders while he was in the holding cell. Likely due to Bexar County's continued issues over a lengthy of time, the TCJS wrote, "The lead inspector will follow up with unannounced visits to review documentation and interview staff and inmates to ensure that all doctor orders are followed as required by minimum jail standards."

101.    Further, while walking through the facility, the TCJS inspection team saw five females and one male in holding cells in the transport hub. The inspection team saw all such detainees being restrained in leg irons. Oddly, jail staff did not identify any of the detainees as being combative or indicating self-harm tendencies. Further, unbelievably, TCJS determined that

the detainees had been in cells for up to four days in leg irons. TCJS wrote as a result, "The administration will implement a plan of action, within seven days, to ensure inmates are not placed in holding cells with restraints unless a direct threat to safety and security exists. The plan of action will be emailed to the lead inspector for review."

102.    Further, during that inspection, and as further evidence of the general disregard for the health and safety of detainees, when walking through the jail, the inspection team saw sanitation issues needing to be addressed in both jail kitchens. These areas included trays, sporks, dirty cooking racks from previous meals, and dirty cookware. There were fruit flies and gnats in several areas throughout the main jail facility. TCJS required Bexar County jail administration to develop a plan of action, within 30 days, to address the sanitation issues. Further, TCJS wrote, "If vast improvement is not observed, within 60 days, on the areas identified to include the rate of work order completion, the facility shall be placed in non-compliance."

103.    Further, during that inspection, while walking through the facility, the inspection team "observed numerous maintenance issues needing addressing throughout the main jail facility and annex." Significant areas included the kitchen, uneven flooring and exposed concrete, unsecured metal paneling at junctions between floor and walls, a ceiling leak, several cells missing or having loose floor tiles (which were a safety and security concern), metal windowsills rusting out on portions of recreation yards, numerous tamper-resistant screws missing, lights out, ceiling tiles damaged and missing, and apparent mold on the ceilings of janitor closets. Further, showers needed cleaning to remove soap scum buildup and mildew in the annex shower areas, and there were plumbing issues. Maintenance and administration identified 36 cells which were inoperable due to maintenance issues. Maintenance staff also produced approximately 700 open work orders. The TCJS required jail administration, in conjunction with facilities maintenance administration, to develop a plan of action within 30 days, to include begin and end dates for each project.

104. Finally, during that inspection, while reviewing inmate grievances, the TCJS inspection team saw that the medical department was directly answering medical grievances. Medical staff responding directly did not provide a response from an independent arbitrator, and nonbiased staff, in accordance with Bexar County's approved operational plan.

105. TCJS inspected the Bexar County jail again from March 22 through 25, 2021. TCJS inspectors, while observing control room officers in the housing areas of the main jail, found that on occasion an officer would leave the control room to complete face-to-face observations in a cell and thus leave intercoms unattended. It is important to have intercoms attended, as that is the primary way in which any detainee in a cell could notify someone if medical or other assistance is needed. Jail administration confirmed that the intercoms in the main jail could not be transferred to central control. The TCJS inspection team recommended that jail administration implement a plan of action to ensure that inmates always had two-way communication with jailers as required by TCJS minimum jail standards.

106. Further, while conducting a fire drill at the annex, the lead inspector saw that the controller and officer did not announce the emergency code until nearly two minutes into the drill. That lead inspector also saw control room officers continued to operate doors for all other normal traffic, which appeared to slow down the response of the CERT team. The inspection team recommended that jail administration implement a plan of action to ensure that control room officers can consistently prioritize access of the responding CERT team to emergencies and that all other normal traffic is ceased until the emergency is cleared by the control room officer. The inspection team also recommended that once a plan of action was in place, the administration provide training for all jail staff. TCJS required the jail administration email to the inspector a plan of action and roster of training within 30 days.

XI    **Suffering and Death of Other Detainees in the Bexar County Jail**

107. Other suffering and death in the Bexar County jail supports *Monell* liability. On

January 7, 2010, Ricardo Guzman, who was known to be detoxing, was found unresponsive in his cell when he was observed lying in his bed with his arm stretched out and his mouth open. The jailer called a code, and a supervisor began CPR on Ricardo. The San Antonio Fire Department arrived but could not revive Ricardo, and he was pronounced deceased.

108.    On February 9, 2010, Joe Lopez was found deceased in his cell during a headcount at 11:01 PM when the Deputy noticed Joe's cell window being covered by a piece of cardboard. CPR only started at 11:04 PM after the jail's staff performed a brief evaluation on Mr. Lopez, but he was ultimately pronounced deceased. It is not known if Mr. Lopez had a history of mental illness or suicidal tendencies, as the custodial death report is left blank at the question "Exhibit any mental health problems?"

109.    On May 22, 2010, jail staff discovered Theresa Olden laying face-down in front of her cell door, with no pulse. CPR began immediately until EMS arrived and took over lifesaving measures. CPR was discontinued, and Theresa was pronounced deceased.

110.    On May 28, 2010, Nicholas Tucker was found in his cell with a bed sheet tied around his neck at 11:03 PM. No jailers had performed a face-to-face observation of Nicholas since 10:25 PM. Jailers began CPR immediately and continued until he was pronounced deceased by EMS personnel.

111.    On October 22, 2010, Noe Rodriguez was discovered to be unresponsive and not breathing when a jailer checked on him after noticing he had not eaten his breakfast. CPR was performed, but he was ultimately pronounced deceased. The cause of death was listed as cardiopulmonary disease, but it is not known if he exhibited any signs of illness before his death.

112.    On November 1, 2010, Eulalio Hernandez was admitted to the hospital due to "worsening medical condition related to a lung cancer diagnosis." He was resuscitated by medical staff on November 2, 2010, but his heart rate stopped less than an hour later, and he was pronounced deceased. It is unknown if he was receiving any treatment in the jail for his condition.

113.   On November 29, 2010, Mark Montoya was found hanging from his bunk. The San Antonio Fire Department arrived and pronounced Mark deceased after attempting CPR. The report provides no answer to the "exhibit any mental health problems?" and "exhibit any medical problems?" portions of the report.

114.   On December 25, 2010, Richard Lopez was discovered by his cellmate to be unresponsive, lying on his bunk. His cellmate alerted the unit officer, who noted that Richard was already stiff and cold to the touch. The custodial death report lists the cause of death as "small vessel cardiomyopathy" but reports "unknown" to the question of whether or not Richard had any preexisting medical conditions.

115.   On January 22, 2011, Anthony Tootle was found hanging from a towel rack by his cellmate. Another inmate began chest compressions on Anthony while the deputy on duty called a "Code 1" medical emergency. The San Antonio Fire Department arrived and pronounced Anthony deceased, approximately 15 minutes after he was discovered by his cellmate.

116.   On June 23, 2011, Adrian Rodriguez was discovered hanging from a shelf above the sink in his cell during a unit observation check. Adrian was still alive when he was discovered, as the jailer noted that he was "breathing loudly but seemed to be struggling." Adrian was transferred to a local hospital, where he passed away after being released from jail custody.

117.   On July 20, 2011, Pamela Anguiano was found unresponsive in her cell while detoxing from heroin. CPR was initiated, and EMS arrived, but Pamela was ultimately pronounced deceased. The custodial death report lists her cause of death as "undetermined" and answers "no" to the "appear intoxicated (alcohol or drugs)" question.

118.   On July 25, 2011, Leroy Sanchez, Jr. was found hanging in his cell and was shortly after transported to the Santa Rosa Hospital. He was placed on a ventilator until July 28, when a family decision was made to remove the ventilator. Mr. Sanchez passed away that evening.

119.   On October 2, 2011, Jason Biesenback alerted jail staff that he was experiencing

chest pain and tingling in his legs. Jason became unresponsive while waiting for the ambulance to arrive and died shortly after arriving at the hospital. His cause of death was attributed to his prior diagnosis of HIV.

120.     On October 14, 2022, Roger Peters, Jr. was found hanging in his cell by another inmate, who alerted a jailer during unit relief. Jail staff used the automatic external defibrillator, but Roger was ultimately pronounced deceased by a physician's assistant at the jail. EMS did not arrive until roughly 8 minutes after Roger passed away.

121.     On May 21, 2012, Corey Hiller was discovered in his bed, unresponsive with a sheet tied around his neck, by an officer attempting to wake him. The custodial death report notes that he was in a hospital bed, but it does not mention any prior medical problems. He was pronounced deceased by EMT personnel after noticing signs of lividity.

122.     On June 26, 2012, Robert Rodriguez prematurely ended his scheduled dialysis treatment. Later that day, the jailers responded to a call from another inmate, stating that Robert was bleeding profusely due to a self-inflicted wound. He was taken to the hospital by ambulance but became unresponsive during the ride and was pronounced deceased upon arrival at the hospital.

123.     On July 19, 2012, Alfonso Guerro was taken to the hospital after suffering a stroke following his refusal of two doses of insulin. He was placed on life support on July 22, then passed away on July 24 after his family made the call to remove him from life support.

124.     On August 22, 2012, Thomas Taylor was found in his cell leaning against the door, bent at the torso with blood coming out of his nose. Jailers performed CPR on him until paramedics arrived and pronounced him deceased. Although his cause of death is listed as "methadone toxicity and cardiomyopathy," Bexar County answered "no" to the question whether Mr. Taylor appeared intoxicated upon entry to the facility.

125.     On February 2, 2013, Antonio Obregon was found lying on the floor of the dayroom, unresponsive with blood or vomiting on his face. Medical staff aided Antonio until EMS

arrived and transported him to the hospital. Antonio was pronounced deceased upon arrival at the hospital, with his cause of death listed as "hyponatremia of unknown etiology."

126.    On February 28, 2013, Alvin County, who was known to have diabetes and hypertension as well as at the time detoxing, was found having a seizure by his cellmate, who then alerted jail staff. Medical staff began CPR, then determined that Alvin was in a life-threatening emergency and called for EMS. Alvin was taken to the hospital by EMS and was pronounced deceased once at the hospital.

127.    On June 26, 2013, Linda Frazier was found unresponsive lying on the floor of her cell. She did not respond to the administered ammonia inhalants or lifesaving measures performed by EMS and was ultimately pronounced deceased. Her cause of death was attributed to "atherosclerotic and hypertensive cardiovascular disease" and heart disease, while Bexar County answered "don't know" to the question whether Ms. Frazier had any underlying medical conditions.

128.    On August 28, 2013, Danny Puente began having trouble walking as he was being escorted to the booking area to be released from custody. About 45 minutes later, Danny was found sitting unresponsive on the bench in the closing room. He was pronounced deceased, and his death was cited as a ruptured appendix.

129.    On September 22, 2013, Frederick Miller suffered a medical emergency while in custody at Baptist Medical Center. Medical providers could not revive him and attributed his death to complications of cocaine intoxication. Frederick had been in custody for two days before his death.

130.    On October 13, 2013, Johnny Mendoza was discovered lying unconscious under his bed by jail staff. It is stated that he was transported to the hospital at 6:10 PM, and later died at 10:55 PM from a heart attack. The only event noted in those hours is that there was a power failure in Mr. Mendoza's room prior to his death.

Plaintiffs' Original Complaint – Page 24 of 43

131.    On February 7, 2014, Nathaniel Gamez was found hanging from a makeshift noose tied to the air vent on the ceiling of his cell. Lifesaving measures were started, but he was ultimately pronounced deceased by a responding paramedic.

132.    On June 25, 2014, an inmate requested that jailers check on William Richards, who was noted to be housed in a detox cell. The report does not state the condition William was found in, but states that CPR was started as well as the use of an Ambu mask. EMS later pronounced him deceased due to "peritonitis of unclear natural origin."

133.    Desiree Martinez was a patient at the University Hospital while in custody of Bexar County, being treated for a terminal condition unrelated to her incarceration. Her family made the decision to remove her from life support, and she passed away on November 27, 2014.

134.    On November 27, 2014, Felix Chavarria, who was being treated for mental and medical conditions, was found hanging from a light fixture in his cell. He was later pronounced dead after being transported to the hospital.

135.    On January 26, 2015, Henry Davis began vomiting blood due to a gastrointestinal hemorrhage. He was taken to the hospital but died shortly after. It is not known if he had any other medical conditions, but it is noted that he was intoxicated upon arrival at the jail.

136.    On April 19, 2015, Richard Valdez began suffering a medical emergency while being treated at the hospital for an ongoing cancer diagnosis. He was ultimately pronounced deceased as a result of these complications.

137.    On June 21, 2015, Thomas Voigt was found hanging in a utility closet. He was cut down by the living unit officer and taken to the hospital for further treatment. He was later removed from life support, after being released on bond, and passed away that day.

138.    On July 5, 2015, Rodolfo Palafos was found hanging from a makeshift noose in his cell and was shortly later pronounced deceased. It is not known if he had any history of mental illness or made any suicidal statements during his incarceration.

139.    On July 26, 2015, Robert Mosley, who was previously noted to be detoxing and experiencing withdrawal issues, was found unresponsive in the living unit of the jail. One month before, he reported being pushed by another inmate and was prescribed pain medication for the resulting joint pain. He ultimately died of complications of an acetabular fracture with severe retroperitoneal hemorrhage.

140.    On January 1, 2015, Rogelio Vasquez was incarcerated. During his incarceration, he was seen by medicals at various times for a seizure disorder, diabetes, mental health issues, a persistent cough, and flu-like symptoms. He was taken to the hospital on July 30 for possible pneumonia and died on August 7, 2015.

141.    On November 10, 2015, Calvin Johnson was found hanging from a damaged section of the ceiling in his cell. He was pronounced deceased after medical staff attempted CPR on him.

142.    On January 17, 2016, Armando Luna was found unresponsive on his mattress in his cell. Attempts to revive him were unsuccessful and he was pronounced deceased shortly after. It is noted in the custodial death report that he has just completed the jail's detox protocol.

143.    On May 16, 2016, Roger Blackwell began vomiting and was taken to the hospital and put on life support. Roger was on multiple medications and had a history of refusing blood pressure checks in jail. On May 22, Roger's family made the decision to remove him from life support, and he passed away shortly after.

144.    On June 28, 2016, Victor Casas was found hanging in his cell by his cellmate. Lifesaving measures were attempted, but Victor was pronounced deceased upon the arrival of EMS.

145.    On July 6, 2016, Demone Sat berry was found unresponsive in the medical unit. CPR was performed until EMS arrived and pronounced him deceased. Demone was on a long list of medications, but the report does not state what the medications were to be treated.

146.    On July 9, 2016, Jonathan Campos was found in his cell, hanging from a light fixture. Lifesaving measures were attempted, but he was pronounced deceased soon after.

147.    On July 14, 2016, Jesus Lopez was found hanging in his cell. He was transported to the emergency room for treatment but was pronounced deceased on July 15 after scans showed that he had no brain activity.

148.    On July 22, 2016, Melvin McKiney, Jr. was found in his cell, hanging from an air vent. Attempts to revive him were unsuccessful and he was pronounced deceased.

149.    On December 4, 2016, Ricardo Gamez was reported as being unresponsive by a fellow inmate. Emergency medical care was attempted, but Ricardo was soon pronounced deceased by EMS. The report states that Ricardo's nearly year-long incarceration was "unremarkable" up until his death.

150.    On April 19, 2017, Suzanne Zgorzelski was found unresponsive in her cell by a jailer while conducting routine cell checks. After finding no pulse in Suzanne, the jailer began attempting lifesaving measures. Suzanne was ultimately pronounced deceased by the responding EMS agency, and her death was attributed to complications of hepatic cirrhosis.

151.    On July 24, 2017, a jailer contacted medical staff after noticing Cynthia Sanchez had not moved at all in at least 15 minutes. Medical treatment was provided until she arrived at Downtown Baptist Hospital, where she was pronounced deceased by a doctor. Her death was attributed to cirrhosis of the liver.

152.    On October 3, 2017, Skylab Gonzales was discovered laying face-down in bed after hanging himself. The unit officer called for medical assistance and released Skylab from the ligature from which he was hanging. He was later pronounced deceased by responding to EMS personnel.

153.    On October 9, 2017, Terry Fox was discovered lying on the floor of the shower area. The unit officer completed the unit check before returning to Terry and called for medical

assistance. Terry was ultimately pronounced deceased, with his cause of death reading as "cirrhosis of the liver and severe pulmonary emphysema with resolving pneumonia."

154.     On October 21, 2017, Anthony Luna was found unresponsive in his cell, having hung himself behind a partition. He was transported to a hospital once medical personnel found a pulse and was put on life support. Despite this, Anthony was pronounced deceased, and his family allowed him to be removed from life support.

155.     On October 24, 2017, Rebecca Rodriguez suffered a medical emergency and began vomiting. She was transported to the hospital but was showing no vital signs on arrival. She was pronounced deceased due to a "dilated enlarged heart with methamphetamine intoxication."

156.     On April 28, 2018, Domingo Altamirano was found in his cell after hanging himself and was transported to the hospital for treatment. On May 3, he was pronounced deceased. The custodial death states that Domingo had previously made suicidal statements but does not say if he was on suicide watch.

157.     On August 19, 2018, Hazel Nwoye was found lying next to her bed on the floor, unresponsive, by a jailer. Medical staff attempted to resuscitate her several times but were unsuccessful. Her cause of death was attributed to "hypertrophic cardiomyopathy with bronchopneumonia."

158.     On October 23, 2018, Adrianne Martinez, who had a history of chronic pancreatitis, cardiovascular disease, and psychosis, passed away after suffering a medical emergency at the University Hospital. She had been housed at the hospital for about two weeks prior to her death. Her official cause of death was a gastrointestinal hemorrhage.

159.     On December 5, 2018, Santiago Cardenas passed away while in Palliative Care for his ongoing battle with lung cancer. He had previously made the decision not to receive any further treatment and signed a DNR.

160.     On December 14, 2018, Janice Dotson-Stephens was found unresponsive in her

bed. Medical staff performed CPR until EMS personnel arrived and pronounced her deceased. Her cause of death was attributed to "atherosclerotic cardiovascular disease," but it is unknown if Janice exhibited any symptoms before her death.

161.    On December 16, 2018, Fernando Macias was transported to the hospital for treatment of a preexisting medical condition he had been hospitalized for before during his incarceration. He was pronounced deceased that evening due to complications of end-stage renal disease.

162.    On January 10, 2019, Joshua Miranda was transported to the hospital after being found unresponsive in his cell. He was pronounced deceased the next day due to diabetic ketosis. The custodial death report answers "unknown" to the question of if Joshua was receiving any medical treatment for his diabetes.

163.    On March 29, 2019, Jarnell Kimble was taken to the hospital after being found in a state of diabetic ketosis. He passed away later that day at the hospital. The report states that Jarnell was receiving medical treatment for his diabetes but does not specify what kind of treatment.

164.    On April 18, 2019, Jack Ule was found unresponsive in his cell by the unit officer. He was pronounced deceased upon arrival of EMS personnel. His cause of death was attributed to hypertrophic and dilated cardiomyopathy relating to a preexisting medical condition, but also states that he did not exhibit any medical problems upon entry to the jail.

165.    On May 30, 2019, Alexander Wise was found in his cell, lying in a pool of blood. His cellmate had injuries on his hands and was also covered in blood. Alexander was pronounced deceased due to blunt force trauma by the responding physician.

166.    On July 18, 2019, Leon Causey was pronounced deceased after being found unresponsive in his bunk. His cause of death was due to complications of a brain abscess, but it is unknown if he experienced any symptoms leading up to his death.

167.    On July 27, 2019, Ashanti Taylor was found sitting on the floor of her cell after

attempting to hang herself using the gate of her cell door. She was taken to the hospital, where she remained until August 2, when she was pronounced deceased by hospital staff.

168.    On August 5, 2019, Enrique Perez was found in a multi-occupant cell after hanging himself. The responding officer began CPR and continued until EMS personnel arrived. Enrique was pronounced deceased by EMS.

169.    On November 11, 2019, David Watts was found unresponsive in his cell by his cellmate. Lifesaving measures were attempted, but David was ultimately pronounced deceased by the EMS. His cause of death was attributed to a rupture of aortic aneurysm.

170.    On November 11, 2019, Rondell Peterson was found hanging in the holding cell he was stationed in. He was transported to the hospital, but ultimately died of anoxic brain injury due to hanging.

171.    On December 26, 2019, a medical code was called after Stephen Cole did not respond to jailers' attempts to wake him. CPR was initiated and continued until the arrival of EMS, who pronounced Stephen deceased. His cause of death is listed as "acute bronchopneumonia with an enlarged heart," and it is noted that Stephen had a history of hypertension and diabetes.

172.    On February 12, 2020, Claudine Parisi collapsed after complaining of shortness of breath and was shortly transferred to the hospital for treatment. She passed away on February 15 due to "anoxic encephalopathy complicating toxic effects of methamphetamine." The report states it was unknown if Claudine appeared to be intoxicated upon arrival at the jail.

173.    On February 16, 2020, Robert Edwards became unresponsive while being observed in the medical area of the jail. EMS arrived and began lifesaving measures, but Robert was eventually pronounced deceased. His cause of death was attributed to "hypertensive and arteriosclerotic cardiovascular disease," and is noted that he also had diabetes and hepatic cirrhosis.

174.    On March 3, 2020, Joel Sambrano was found in his cell, having hung himself using a nose he tied to the ceiling vent. He was transported to the hospital, but ultimately succumbed to

his injuries and was pronounced deceased later that day.

175.   On April 18, 2020, Clifford Childs was taken to the hospital for a high temperature. It is not stated what treatment he received at the hospital, but Clifford was eventually pronounced deceased on May 4, 2020. He died of septic shock and hypoxic respiratory failure, which the report says he developed after entering the jail.

176.   On July 5, 2020, Eric McCuiston died of a methamphetamine overdose and was found lying in a fetal position on the floor of his cell. Attempts to revive him were unsuccessful, and he was pronounced deceased by responding to EMS personnel. Jailers did not, or were unable to, determine if Eric was intoxicated upon arrival at the jail.

177.   On July 19, 2020, Julie Alvarado was found unresponsive in her cell, with a sheet tied around her neck. Lifesaving measures were attempted, but she was ultimately pronounced deceased by responding EMS personnel. It is not known if Julie expressed any suicidal thoughts prior to her death.

178.   On July 27, 2020, Julian Dena swallowed a "white substance" he had been hiding in his mouth while being processed into the jail. A medical code was not called until nearly 4 hours later, when Julian was transported to the hospital. He died of a methamphetamine overdose on July 30 at the hospital.

179.   On March 4, 2020, Lindsey Turiano was taken to the hospital for "further evaluation," though the report does not say what symptoms he was experiencing at this time. He died in the hospital on August 8, 2020, with the cause of death listed as "pneumonia and other complications of bipolar disorder with catatonia." It is also noted that Lindsey suffered from atherosclerotic cardiovascular disease.

180.   On September 21, 2020, Robert Cantu was found unresponsive in his cell by jailers, who began lifesaving measures and called for EMS. Robert was pronounced deceased that evening by EMS personnel. It was found that he died of methamphetamine toxicity combined with a dilated

enlarged heart, but the report states that it was "unknown" if he was intoxicated upon arrival at the jail a day earlier.

181.    On September 21, 2020, George Holland was found in his cell breathing, but otherwise unresponsive. He was taken to the hospital for treatment but was pronounced deceased that evening due to atherosclerotic cardiovascular disease.

182.    On October 1, 2020, Gilbert Kervils was found in his cell after hanging himself using a sheet tied to his sink. Jailers began chest compressions until EMS arrived, who then took over until Gilbert was pronounced deceased. The report states that Gilbert did not make suicidal statements, but it was unknown if he suffered from any mental illnesses.

183.    On November 25, 2020, Dominga Flores was discovered lying face-down on her cell floor by a jailer conducting face-to-face observations. Upon further examination, it was found that there was a sheet tied around Dominga's neck, so chest compressions were started. Dominga was taken to the hospital via ambulance and was pronounced deceased there.

184.    On November 28, 2020, Lambert Sabrsula was found lying unresponsive on the floor of his cell. CPR was performed until EMS arrived and pronounced Lambert deceased. His death was attributed to "cardiomegaly and complication of mental health disorders," although the report states Lambert did not exhibit any mental health problems upon entry at the jail.

185.    On January 11, 2021, Gregorio Munoz died while being treated at a hospital for Covid-19. The report does not state when he was transferred to the hospital or what kind of treatment he received.

186.    On January 21, 2021, Ryan O'Shea was discovered hanging in his cell after a jailer noticed he had not eaten his breakfast. Lifesaving measures were attempted, but Ryan was ultimately pronounced deceased by a responding EMT.

187.    On January 27, 2021, Gabriel Mendiola began suffering a medical emergency during the booking process at the jail. He was taken to the hospital, where he was subsequently

released on all charges prior to his death. His cause of death was attributed to "anoxic encephalopathy complicating toxic effects of methamphetamine and cocaine."

188.    On January 29, 2021, Robert Yanez was placed on hospice care at the hospital, where he had been receiving treatment for an unknown amount of time. The hospital reported his death to the jail later that day, citing his cause of death as "complications of sepsis with necrotizing pneumonia."

189.    On February 8, 2021, Gerald Irey was transported to the hospital due to an altered mental state. He was placed on hospice care on February 13 and passed away on February 14 upon request by the family to remove him from life support. His cause of death is listed as an intracerebral hemorrhage.

190.    On February 19, 2021, William Shandore was found hanging inside his cell. Lifesaving measures were attempted by jail staff and EMS personnel, but he was ultimately pronounced deceased by the responding EMS medic.

191.    On February 26, 2021, Charles Hector was found unresponsive in his cell by a jailer, who notified medical staff. They began chest compressions, but Charles was eventually pronounced deceased. His cause of death is listed as cardiomyopathy with recent methamphetamine use, and other significant conditions including chronic airway disease, withdrawal, and Covid-19 infection.

192.    On March 26, 2021, Mark Reid was found in his cell during cell checks, having hung himself. The responding jailer cut him down and began chest compressions until medical personnel arrived. Upon arrival of medics, he was pronounced deceased.

193.    On June 19, 2021, Willie McClain suffered a medical episode, prompting medical staff to call for EMS assistance. He was set to be taken to the hospital but became unresponsive and was pronounced deceased by the responding EMS. His cause of death is attributed to pulmonary thromboembolism, and the report states that it is "unknown" whether Willie was

experiencing medical problems upon entry to the facility.

194.    On July 9, 2021, Michael Johnson was found unresponsive in his cell and was therefore transported to the hospital via ambulance. By July 10, he still had not regained consciousness and then coded, leading to his being pronounced deceased. His cause of death was attributed to atherosclerotic cardiovascular disease with severe coronary artery disease.

195.    On July 16, 2021, Julius Price was experiencing symptoms of serious physical issues such as the inability to walk, move, and/or use the restroom. By the time Mr. Price was transported to a local emergency room, it was too late. He died on July 17, 2021.

196.    On July 21, 2021, James Hill died while in a hospital under the jail's care. His cause of death was attributed to complications of injuries sustained from a fall as well as cellulitis with bacteremia, though it does not say when or how he fell.

197.    On September 18, 2021, Donald Hamilton was taken from the jail's medical department to the hospital due to complications of an infection of Covid-19. There he stayed until he passed away on October 4 due to Covid-19 pneumonia with secondary bacterial pneumonia.

198.    On November 8, 2021, a welfare check was called on Richard Altamirano after he previously refused a diabetic check. A code for medical assistance was called upon the arrival of the jailer, who soon after called a medical emergency. Richard was taken to the hospital via ambulance, but soon after died as a result of cardiovascular disease.

199.    On December 5, 2021, Alexandra Gedminas was found unresponsive in her cell. Lifesaving measures were initiated by jailers and continued by responding EMS personnel, but Alexandra was pronounced deceased soon after. Her death was attributed to cardiomegaly with recent methamphetamine use.

200.    On December 15, 2021, Evan Held was found hanging in a utility closet in the jail. Jail staff and the responding EMS agency attempted lifesaving measures, but Evan was ultimately pronounced deceased. While he was found having hanged himself, his cause of death was listed

as "unknown."

201.    On January 29, 2022, Vanessa Estrada was removed from life support after an unknown time of suffering from complications of Covid-19 with disseminated mycobacterium tuberculosis. She passed away soon after.

202.    On January 30, 2022, Vincent Garcia was repeatedly stabbed by two other inmates while being interviewed by a deputy at the jail. The inmates had somehow broken out of their cells and forced their way to where Vincent and the deputy were meeting. Jail staff attempted to treat Vincent's wounds, but he eventually died as a result of his injuries.

203.    On February 15, 2022, jail staff were notified that Daniel Maldonado had passed away at the hospital. He was in the hospital for an unknown period of time suffering from complications of endocarditis. It is unknown if he developed his condition prior to, or during, his incarceration.

204.    On March 24, 2022, Ryan Legg was found in his cell after hanging himself. The jailer promptly cut Ryan from the ligature and began chest compressions, but he was ultimately pronounced deceased by responding EMS personnel. Ryan allegedly did not appear to be suicidal on entry to the facility and was therefore likely not on suicide watch.

205.    On April 21, 2022, a medical code was called for an inmate, Emmitt Byrd, after he was observed in his cell after hanging himself. Lifesaving measures were started by jail staff and continued by EMS once they arrived; however, Emmitt was pronounced deceased by a medic with the responding EMS.

206.    On June 25, 2022, Michael Templeton was pronounced deceased after being found unresponsive in his cell. His cause of death was attributed to neurotic bowl/vascular thrombosis. It could not be determined if Michael previously had any medical conditions on entry to the jail.

207.    On June 20, 2022, William Webb was transferred from the jail to the hospital due to a worsening medical condition. There he remained until June 29, when he passed away due to

hypertensive cardiovascular disease with congestive heart failure. The report states that William did not show signs of illness on entry to the jail, but was receiving some sort of treatment before being taken to the hospital.

208.    On August 29, 2022, Rebecca Vasquez was discovered hanging in her cell during an observation check. She was promptly cut down and transferred to the hospital for treatment. After being approved for a PR bond, on September 7, she passed away in the hospital.

209.    On September 22, 2022, Rogelio Hernandez was found not to be breathing by a cellmate, who promptly alerted jail staff. Lifesaving measures were attempted by jail staff and the responding EMS team, but Rogelio was eventually pronounced deceased. His cause of death was attributed to hypertensive and arteriosclerotic cardiovascular disease, though it is unknown if he previously displayed a need for medical attention.

210.    On October 21, 2022, James Whitehead was found unresponsive with no pulse by a jailer who had come to perform a routine diabetic check. Chest compressions were started by the jailer and continued by the responding EMS team until James was pronounced deceased. While it is unknown if James was being treated for his diabetes, his ultimate cause of death was due to arteriosclerotic cardiovascular disease.

211.    On November 2, 2022, Juan Guerrero was found in his cell after hanging himself and was transported to the hospital for treatment. While at the hospital, he, unfortunately, succumbed to his injuries and passed away. The report states that Juan made no suicidal statements on intake and was therefore likely not on suicide watch.

212.    On November 3, 2022, Joseph Zepeda was involved in an "incident" in the jail, though the report does not state what happened during the incident or what injuries Joseph sustained. He was transported to the hospital, where he later died on November 23. An autopsy was later performed which showed the cause of death to be due to blunt force trauma.

213.    On December 5, 2022, Derrick Ellison died while in the hospital after experiencing

difficulty breathing while in jail. His cause of death was listed as "sepsis/periorbital cellulitis/periocular hemorrhage, swelling, and discoloration." It states that his condition developed while in jail, but not when he began experiencing symptoms.

214.    On January 12, 2023, Christopher Pangelinan was discovered in his cell after hanging himself. He was cut down and attempted to be revived but was ultimately pronounced deceased by the responding EMS team. It is stated that he did not previously make suicidal statements, nor did the jailers believe he showed signs of mental illness during the booking process.

215.    On January 25, 2023, Daniel Pentkwoski was found unresponsive in his cell, prompting jailers to call a medical emergency code. Lifesaving measures were unsuccessful, and Daniel was pronounced deceased. It was later determined that his cause of death was listed as "physical restraint with compression of torso following a physical struggle, complicating arteriosclerotic cardiovascular disease and pulmonary emphysema."

216.    On March 31, 2023, Hector Lopez fell out of his bunk and stopped breathing. He was taken to the hospital for treatment but was pronounced deceased shortly after. His cause of death was later determined to be due to cardiomegaly associated with hypertensive cardiovascular disease and morbid obesity.

217.    On June 28, 2023, Jose Barrera was taken to the hospital after suffering an unknown medical emergency while in jail. He remained there until July 7, when he then passed away due to complications of an intraventricular hemorrhagic stroke. The CDR report mentions Mr. Barrera exhibited medical issues on entry to jail but lacks specific details on those medical issues.

218.    On June 30, 2023, Darlene Francis was found lying face-down and unresponsive in her cell. Medical staff at the jail attempted lifesaving measures, but Ms. Francis was ultimately pronounced deceased by the responding EMS agency. At the time of this writing, Ms. Francis' autopsy had not been completed, so her cause of death is unknown.

219.    On July 2, 2023, two officers found Verne Freeman unresponsive in his cell while

attempting to administer his medication. They began lifesaving measures on Mr. Freeman until EMS personnel arrived, but he was ultimately pronounced deceased. At the time of this writing, the autopsy being performed on Mr. Freeman was not yet complete, so his official cause of death is unknown.

220.    This section does not include, upon information and belief, all deaths in or related to the Bexar County jail during the period covered. It also does not include all serious injuries occurring short of death as a result of the policies, practices, and/or customs of Bexar County.

## XII.    Bexar County Policies, Practices, and Customs

221.    Plaintiffs list beneath this heading, in addition to others referenced or described through factual allegations in this pleading, some specific County policies, practices, and/or customs which Plaintiffs allege, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the Plaintiff's suffering and injuries. Thus, the County is liable for all such damage. These policies, practices, and/or customs worked individually, or in the alternative together, to cause the Plaintiff's damage asserted in this pleading. Plaintiffs plead conditions of confinement claims arising from policies, practices, and/or customs. Deliberate indifference is not an element of, or a requirement to prove, conditions of confinement claims. In the alternative, Plaintiffs plead episodic act and/or omission claims arising from policies, practices, and/or customs. Plaintiffs plead, to the extent necessary, that deliberate indifference underlying episodic act and/or omission claims, upon information and belief, occurred with regard to relevant actors. Regardless, Plaintiffs ask that the court apply the correct law to the facts pled, as required by Supreme Court precedent.

222.    One or more courts have recognized that it is exceedingly rare that a plaintiff will have access to or personal knowledge of specific details regarding the existence or absence of a

county defendant's internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiffs thus plead the following specific policies, practices, and customs which give rise to conditions of confinement claims, or in the alternative episodic act and/or omission claims, in this portion of the complaint upon information and belief:

- First, County failed to monitor or in the alternative had inadequate monitoring of detainees.

- Second, upon information and belief, County failed to reprimand and/or take remedial action against employees and/or agents as a result of action and/or inaction related to the Plaintiff/claimant's suffering, thus confirming that the policies, practices, and/or customs which led to such suffering and injuries were in fact *de facto* County policies.

- Third, County, in the alternative, while monitoring detainees, failed to secure the holding cell doors from access by inmates and or opened the holding cell doors in a negligence manner ,thus allowing the assault by inmates to take place.

- Fourth, the County housed together in a holding cell detainees who were likely to be violent toward each other based on information known about them.

- Fifth, the County housed together in a holding cell, in street clothes, detainees whose risk level had not yet been through the classification process based on history, mental status, and violent tendencies. County classification procedures and/or practices apparently did not account for serious risk of harm to detainees and improperly housed detainees together.

- Sixth, the County chose not to sufficiently staff its jail.

- Seventh, a Bexar County Adult Detention Center written policy regarding supervision and control of inmates provided for a maximum time interval for observation of detainees in the Bexar County Jail. However, apparently contrary to TCJS minimum standards, visual observations were to be conducted on an irregular basis. TCJS minimum standards, and every known jail standard, requires visual observations when observing detainees in their cells. Moreover, that written policy required "actual opening of the cell doors . . . on an irregular basis."

- 

- Tenth, the County had longstanding and well-known policies, practices, and

customs regarding employment, employee compensation, employee benefits, and employee working conditions which led to long hours and general jail employee dissatisfaction, malaise, and ambivalence regarding detainee needs and monitoring.

- Eleventh, a written policy contained in Chapter Nine, security, and control, of the Bexar County Adult Detention Center described how often observation checks must be made of specified portions of the jail. The only situation calling for a continuous uninterrupted basis was for a "constant suicide watch observation." In such a case, the watch would be documented every 30 minutes. However, even with a close suicide watch observation, a detainee would only have to be checked every 30 minutes. This was also true, with particular importance in this case, in the holding cells. Those detainees kept in holding cells only had to be checked once every 30 minutes. When Bexar County decided to implement this written policy, it knew with a certainty that a person could be asphyxiated in one to three minutes, and possibly less. It also knew of other ways in which a fellow detainee could injure a person. Nonetheless, it chose to only have a maximum interval during which people in holding cells would be checked for 30 minutes. This, combined with the failure to remove clothing and other items, was a clear recipe for disaster.

- Twelfth, the County decided not to have cameras mounted in holding cells. Cameras in holding cells would allow continuous observation and, in the case of Mr. Gomez, the ability to intervene .

- Thirteen, upon information and belief, County failed to train its employees regarding things including proper cell checks, classification of detainees, risk of detainee assaults, and/or the necessity of promptly responding to detainee safety requests.

## XIII. Causes of Action

### A.     Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983: and the Eight Amendment United States Constitution and the Fourteenth Due Process Clause

223.    In *Waco V. Hester ,805 745S.W. 2nd ,807,* held that a prisoner' as right under the eight

amendment to be reasonably protected from violence or sexual assault by fellow inmates .

## XIV.   Remedies for Constitutional Rights Violations

Plaintiff seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, under the civil rights claims pursuant to 42 U.S.C. section 1983.,the Eight Amendment ,and the Texas Constitution, common law, and all related and/or supporting case law. The plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

## XV.   Cause of Action Against Bexar County Under 42 U.S.C. Section 1983 for Violation of Constitutional Rights

In the alternative, without waiving any other causes of action pled herein, without     waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Bexar County is liable to Plaintiff , pursuant to 42 U.S.C. section 1983, for violating the plaintiffs' constitutional rights including but not necessarily limited to the rights to receive reasonable medical/mental health care, to be protected, and/or not to be punished as a pretrial detainee. These rights are guaranteed by at least the Fourteenth Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

224.    County employees and agents acted or failed to act under the color of state law at all relevant times. County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the Plaintiff's suffering, damages, and personal injuries, and all damages suffered by Plaintiff .

225.    Controlling Fifth Circuit Court of Appeals precedent has made it clear that Plaintiffs have no obligation to identify the appropriate chief policymaker(s) at the stage of the pleadings. Any argument to the contrary would be made in bad faith. Nevertheless, out of an abundance of caution, the County's sheriff was County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County's jail administrator was the relevant policymaker.

226.    The plaintiff seeks, for 42 U.S.C. section 1983 constitutional violations, the following:

- past mental anguish and emotional distress suffered  resulting from and caused by the plaintiff's injuries by the assault herein.

- future mental anguish and emotional distress suffered resulting from and caused by the plaintiff's injuries by the assault.

- past and future permanent personal injuries as a result of plaintiff's assault

- past and future medical expenses.

- loss of ability to have children as a direct injury as a result of Plaintiff's assault .

Moreover, Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. sections 1983 and 1988.

## XVI.    Concluding Allegations and Prayer

a.  Conditions Precedent

D. All conditions precedent to the assertion of all claims herein have occurred. Plaintiff   gave notice of claim pursuant to the Texas Tort claim .

## XVII.    Use of Documents at Trial or Pretrial Proceedings

227.    Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by the Defendant in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

## a.  Jury Demand

228.    Plaintiffs demand a jury trial on all issues which may be tried by a jury.

### Prayer

229.    For these reasons, Plaintiffs ask that Defendant be cited to appear and answer, and that Plaintiff  have judgment for damages within the jurisdictional limits of the court and against Defendant for all damages referenced above ,reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. sections 1983 and 1988;

a)     court costs and all other recoverable costs.

b)     prejudgment and post judgment interest at the highest allowable rates; and

c)     all other relief, legal and equitable, general, and special, to which Plaintiff

is entitled.

Blas H. Delgado
2806 Fredericksburg Rd, Suite 116
San Antonio, Texas
Texas Bar No 05725700
Tel: (210) 227- 4186
Fax: (210) 941-0660
E-mail: *delgadoblas@yahoo.com*

Attorneys for Plaintiff